## AFFIDAVIT OF SPECIAL AGENT DEREK GEREGA

I, Derek Gerega, Special Agent with the Federal Bureau of Investigation, being duly sworn, depose and state as follows:

## INTRODUCTION

1.  I have been a Special Agent with the Federal Bureau of Investigation ("FBI") for approximately three years. Since 2017, I have been assigned to the Worcester, Massachusetts, Resident Agency of the FBI. In my capacity as a Special Agent, I have received training and gained experience in search and seizure, arrest procedures, money laundering, crimes against children, fraud, drug offenses and various other crimes. I also have experience in investigating activities involving cryptocurrencies. I have participated in the execution of numerous federal search warrants and criminal complaints. In addition, I am a Certified Public Accountant in the state of New York and I worked as an auditor in a public accounting firm for approximately six years prior to joining the FBI.

## PURPOSE OF AFFIDAVIT

2.  I make this affidavit in support of an application for a criminal complaint and arrest warrant charging Alan JOSEPH a/k/a "Joal" a/k/a "Joal19" (born 1988) with operating an unlicensed money transmitting business, in violation of Title 18, United States Code, Section 1960, and money laundering, in violation of Title 18, United States Code, Section 1956 (the "Subject Offenses").

3.  This affidavit does not contain every fact known to me with respect to this investigation. Rather, it contains only those facts that I believe to be necessary to establish probable cause for issuance of the requested criminal complaint and arrest warrant. Similarly, when describing information derived from a particular source (for example, an email, recorded

1

meeting, or an interview), this affidavit does not seek or purport to describe all of the information reflected in such source or convey information verbatim but, rather, simply seeks to summarize select portions or excerpts of the information reflected in that source.

## RELEVANT STATUTES

4. In accordance with Title 18, United States Code, Section 1960, it is a crime to knowingly conduct, control, manage, supervise, direct, or own all or part of an unlicensed money transmitting business. An unlicensed money transmitting business includes money transmitting businesses that affect interstate or foreign commerce and that fail to comply with federal money transmitting business registration requirements or regulations, including those set out in Title 31, United States Code, Section 5330.

5. "Money transmission" is defined under Title 18, United States Code, Section 1960 as "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier."

6. In accordance with Title 31, United States Code, Section 5330 "any person who owns or controls a money transmitting business shall register the business (whether or not the business is licensed as a money transmitting business in any State) with the Secretary of the Treasury not later than the end of the 180-day period beginning on the . . . (B) . . . the date on which the business is established."

7. In accordance with Title 18, United States Code, Section 1956(a)(3), it is a crime to "with the intent to promote the carrying on of specified unlawful activity; or to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity . . . to conduct or attempt to conduct a financial

transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity."

8.      In accordance with Title 18, United States Code, Section 1956(c)(7)(D), "specified unlawful activity" includes trafficking in counterfeit goods or services in violation of Title 18, United States Code, Section 2320.

9.      In accordance with Title 18, United States Code, Section 2320, it is a crime to traffic in goods or services and knowingly use a counterfeit mark on or in connection with such good or services.

## PROBABLE CAUSE

10.     As described below, there is probable cause to believe that JOSEPH has committed the Subject Offenses.

11.     On May 31, 2019, JOSEPH conducted a Bitcoin transaction with a confidential source ("CS").[1] At the direction of case agents, the CS contacted JOSEPH via text message and arranged a meeting on May 31, 2019 in a commercial parking lot in Fitchburg, Massachusetts. Agents observed JOSEPH arrive at meeting location in JOSEPH's Vehicle. The CS – who was provided an audio-recording device by agents – entered the JOSEPH's Vehicle. The CS handed JOSEPH $30,000 in cash and JOSEPH then verified the amount by using an electronic money counter. The CS sent JOSEPH his Bitcoin wallet address via text message. JOSEPH charged the CS a transaction fee of approximately $2,800 and then sent the CS $27,200 worth of Bitcoin using a mobile application on JOSEPH's cell phone. Furthermore, agents verified that JOSEPH did not file a currency transaction report (a "CTR") with the Department of Treasury's Financial Crimes

---

[1] The CS does not have any convictions or charges reflected on his criminal history. The CS cooperated with law enforcement for consideration on potential criminal charges.

Enforcement Network ("FinCEN") as is required for any transaction involving $10,000 or more in cash currency.[2]

12.     On August 14, 2020, JOSEPH engaged in an exchange of cash for bitcoin with an undercover federal law enforcement agent ("UCA"). The UCA first contacted JOSEPH by cell phone and they arranged to meet at a Fitchburg shopping center. During that meeting (which the UCA audio-recorded), the UCA provided $12,000 in cash to JOSEPH. After verifying the amount, JOSEPH used his cellphone to send Bitcoin to the UCA's Bitcoin Wallet, hosted by Bitpay.[3] JOSEPH charged a transaction fee of 7%, which he deducted from the Bitcoin that he sent to the UCA. At no time during the meet did JOSEPH request any identification from the UCA nor verify his identity before conducting the financial transaction. According to the FinCEN database, JOSEPH did not file a CTR for this transaction.

13.     During the August 14, 2020 recorded meeting, the UCA also explained to JOSEPH that he needed the Bitcoin to purchase "purses and jackets and stuff" from "Chinese guys." He further stated that his supplier previously accepted cash, but now wants Bitcoin "for a bunch of fake Gucci sh*t." The UCA further explained that he traveled to Toronto, Canada to pick up those counterfeit goods that he sells.

14.     On October 28, 2020, JOSEPH again engaged in an exchange of cash for Bitcoin with the UCA. The UCA and JOSEPH again met in Fitchburg and conducted their Bitcoin transaction (which the UCA audio-recorded) in JOSEPH's vehicle. The UCA provided JOSEPH with $25,000 in cash. JOSEPH verified the amount by using an electronic money counter that he kept in his car. After verifying the amount, JOSEPH again used his cellphone to send the Bitcoin

---

[2] *See* 31 C.F.R. §§ 1010.311 and 1022.311.
[3] I know from contacting Bitpay that its computer servers are located in the Commonwealth of Virginia. Therefore, this transaction affected interstate commerce.

4

(minus a 9% transaction fee) to the UCA's Bitcoin Wallet hosted by Bitpay. At no time during the meet did JOSEPH request any identification from the UCA nor verify his identity before exchanging the cash for Bitcoin. Furthermore, JOSEPH did not file a CTR with FinCEN.

    15.    During the October 28, 2020 meeting, JOSEPH and the UCA also discussed (a) JOSEPH's desire to avoid government oversight; (b) the UCA's involvement in selling counterfeit goods; and (c) JOSEPH's interest in obtaining counterfeit goods from the UCA. Specifically:

> *Discussion of JOSEPH desire to avoid government oversight:*
>
>> JOSEPH: If it continues this way, I will have to either shrink the business or go MSB [money service business], which I'm really trying not to go that direction, cause I don't…
>>
>> UCA: That sounds like reporting or something.
>>
>> JOSEPH: Yeah, that's reporting. That's paperwork, that's reporting, that's all sorts of, that's using banks.
>>
>> UCA: Yeah, I won't be around then.
>>
>> JOSEPH: Yeah, so you see my dilemma.
>
> *Discussion of UCA selling counterfeit goods:*
>
>> JOSEPH: Any new bills in here?
>>
>> UCA: Ah, bro, I don't know what these rich housewives like to give for fake sh*t.
>
> *Inquiry by JOSEPH on what the UCA can supply:*
>
>> JOSEPH: What I wanted with the conversation is, what can you supply?
>>
>> UCA: As in?
>>
>> JOSEPH: Goods, you do handbags, jackets, etc.?

UCA: Bro, you tell me what you want, I can get it. Um between the handbags, the jackets, the NorthFace, the hockey stuff, um I mean I got vendors pretty much anywhere.

*Discussion of UCA providing counterfeit goods to JOSEPH to sell:*

JOSEPH: Yeah, as long as you have the market for it.

UCA: Well yeah.

JOSEPH: I'd have to make the market, that's not my thing right now.

UCA: Well if you middle it to someone else, you know, you're going to get a couple points here and there, so I mean obviously you make it worthwhile. Um, I mean, you're getting purses for anywhere from like $5 to $10 bucks, and you're turning around, you put the, you put the labels on them, the Kors labels, the Gucci labels, you put all that on them, you're turning around you're getting $500 to $600 bucks for them. Right? It's fuc*ing crazy what these people will pay.

16. Federal regulations require an individual like JOSEPH who engages in money transmission to register with FinCEN as a money service business (MSB) and to develop and maintain an effective anti-money laundering (AML) program.[4] On January 23, 2021, agents checked the FinCEN database using JOSEPH's name and social security number and found no record of JOSEPH ever having registered with FinCEN as a money transmitting business.

## SUMMARY OF PROBABLE CAUSE

17. In summary, there is probable cause to believe that, on October 28, 2020, JOSEPH committed money laundering, in violation of Title 18, United States Code, Section 1956(a)(3). First, JOSEPH conducted a financial transaction by converting cash into Bitcoin for the UCA.

---

[4] *See* 31 C.F.R. §§ 1022.210, 1022.380.

Second, the UCA represented that the funds he was converting to Bitcoin were proceeds of a specified unlawful activity, i.e. trafficking in counterfeit products, by telling JOSEPH that he did not know what kinds of bills "rich housewives" gave for counterfeit handbags.  Third, JOSEPH acted with an intent to promote the carrying on of specified unlawful activity because he converted cash to Bitcoin for the UCA after the UCA had told him he used the Bitcoin to purchase "purses and jackets and stuff" from sources in China.  Fourth, JOSEPH acted with an intent to conceal the nature, location, source, ownership or control of property believed to be proceeds of the specified unlawful activity by not requesting any identification from the UCA; not filing a CTR for the trade; not maintaining an active registration as a money transmitter with FinCEN; and seeking to avoid government oversight.

18.     There is further probable cause to believe that on October 28, 2020, JOSEPH operated an unlicensed money transmission business in violation of Title 18, United States Code, Section 1960 because he had not registered his business with FinCEN in accordance with Title 18, United States Code, Section 5330.  This was required by the time of the October 28, 2020 transaction because JOSEPH had been engaging in money transmission services for at least 180 days by that time seeing his earlier transaction on May 31, 2019 with the CS.

[CONTINUED ON NEXT PAGE]

## CONCLUSION

19. Based on the foregoing, there is probable cause to believe that JOSEPH has committed the Subject Offenses and I respectfully request that the Court issue a criminal complaint and arrest warrant.

Sworn to under the pains and penalties of perjury,

_____
Special Agent Derek Gerega

Sworn to via telephone in accordance with Federal Rule
of Criminal Procedure 4.1 on February __3__, 2021:     5:22 p.m.

_____
David H. Hennessy
United States Magistrate Judge

8